| | | |
|---|---|---|
| RAFAEL BARRAGAN OCHOA, | ) | 1:09-cv-00018-SMS |
| | ) | |
| Plaintiff, | ) | DECISION AND ORDER DENYING |
| v. | ) | PLAINTIFF'S SOCIAL SECURITY |
| | ) | COMPLAINT (DOC. 1) |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | ORDER DIRECTING THE ENTRY OF |
| SECURITY, | ) | JUDGMENT FOR DEFENDANT MICHAEL J. |
| | ) | ASTRUE, COMMISSIONER OF SOCIAL |
| Defendant. | ) | SECURITY, AND AGAINST PLAINTIFF |
| | ) | RAFAEL BARRAGAN OCHOA |
| | ) | |

Plaintiff is proceeding in forma pauperis and with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application of January 23, 2006, made pursuant to Titles II and XVI of the Social Security Act, for a period of disability and disability insurance benefits (DIB), and for supplemental security income (SSI), in which he alleged that he had been disabled since July 13, 2005, due to lower back injury, left leg pain, memory problems, epilepsy causing an inability to stand or sit for long periods, difficulty walking, and pain upon too much movement. (A.R. 13, 105-11, 124.) The parties have consented to the jurisdiction of the United States Magistrate

1

Judge pursuant to 28 U.S.C. § 636(c)(1), manifesting their consent in writings signed by the parties' authorized representatives and filed on behalf of Plaintiff on January 7, 2009, and on behalf of Defendant on January 21, 2009. Thus, the matter is assigned to the Magistrate Judge to conduct all further proceedings in this case, including entry of final judgment.

The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) Christopher Larsen, dated September 3, 2008 (A.R. 13-20), rendered after a hearing held on April 21, 2008, at which Plaintiff appeared and testified with the aid of a Spanish interpreter and with representation by an attorney. Vocational expert (VE) Mr. Shapiro also testified. (A.R. 13, 46.)

After receiving additional evidence and making it part of the record, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on December 10, 2008 (A.R. 1-4), and thereafter Plaintiff filed the complaint in this Court on January 5, 2009. Briefing commenced with the filing of Plaintiff's opening brief on August 10, 2009, and was completed with the filing of Defendant's brief on September 12, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), which provide that an applicant suffering an adverse final determination of the Commissioner of Social Security with respect to disability or SSI benefits after a hearing may obtain judicial review by initiating a civil action in the district court within sixty days of the mailing of the

notice of decision. Plaintiff timely filed her complaint on
January 5, 2009, less than sixty days after the mailing of the
notice of decision on or about December 10, 2008.

II. Standard and Scope of Review

Congress has provided a limited scope of judicial review of
the Commissioner's decision to deny benefits under the Act. In
reviewing findings of fact with respect to such determinations,
the Court must determine whether the decision of the Commissioner
is supported by substantial evidence. 42 U.S.C. § 405(g).
Substantial evidence means "more than a mere scintilla,"
Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
(9th Cir. 1975). It is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
Richardson, 402 U.S. at 401. The Court must consider the record
as a whole, weighing both the evidence that supports and the
evidence that detracts from the Commissioner's conclusion; it may
not simply isolate a portion of evidence that supports the
decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.
2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).
It is immaterial that the evidence would support a finding
contrary to that reached by the Commissioner; the determination
of the Commissioner as to a factual matter will stand if
supported by substantial evidence because it is the
Commissioner's job, and not the Court's, to resolve conflicts in
the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th
Cir. 1975).

3

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

III. Disability

A. Legal Standards

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to

return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[1] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is

---

[1] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

essentially the same. <u>See</u> 20 C.F.R. § 416.920.

B. <u>The ALJ's Findings</u>

The ALJ found that Plaintiff had severe impairments of lumbar degenerative disc disease and seizure disorder secondary to cysticercosis, but Plaintiff had no impairment or combination of impairments that met or medically equaled a listed impairment. (A.R. 15-16.) Plaintiff retained the residual functional capacity (RFC) to lift and carry twenty pounds occasionally and ten pounds frequently; sit or stand and walk a total of six hours out of an eight-hour day; never climb ladders, ropes, or scaffolds; occasionally crouch, crawl, and climb ramps or stairs; frequently balance and kneel; and avoid even moderate exposure to hazards. (A.R. 16.) Plaintiff could not perform his past relevant work, but as a thirty-five-year-old or younger person at the alleged date of onset who was illiterate but able to communicate in English, and who had the aforementioned RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy, including housekeeping cleaner, DOT 323.687-014, with 53,600 positions in California and about 406,500 nationally; raw shellfish preparer, DOT 311.674-014, with about 4,500 positions in California and about 41,400 nationally; and agricultural produce sorter, DOT 529.687-186, with about 1,300 positions in California and about 3,600 nationally. (A.R. 19.) Accordingly, Plaintiff was not disabled at any time from July 13, 2005 to the date of decision, namely, September 3, 2008. (A.R. 19-20.)

C. <u>Plaintiff's Contentions</u>

Plaintiff argues that the ALJ ignored Plaintiff's mental impairments and the opinion of Ricardo Carrillo, Ph.D.; further,

6

the ALJ failed to state legally sufficient reasons for rejecting Dr. Carrillo's opinion. The ALJ failed to consider the record as a whole, and the record lacked substantial evidence to support the ALJ's conclusions concerning Plaintiff's mental impairments.

## IV. The Medical Record[2]

From 2004 through 2008, Plaintiff visited the Darin M. Camarena Health Centers, Inc., and saw multiple physicians. (A.R. 309-75.) In September 2004, he reported that his last seizure was about three months before. (A.R. 374.) His seizures were "stable" in March 2005. (A.R. 372.)

On July 1, 2005, about ten days before the alleged date of onset, Plaintiff visited Andres Zimmermann, M.D., to follow up on his seizure disorder. (A.R. 203-04, 367-68.) Plaintiff reported that since about ten months before when he had started taking Dilantin daily, he had not had a seizure, although sometimes he

---

[2] The medical evidence pertinent to Plaintiff's impairment involving back pain is not summarized because Plaintiff's contentions relate to his cysticercosis, epilepsy, and mental impairments. The Court notes that Plaintiff reported a one-month history of back pain from a work injury caused by lifting heavy objects on July 13 and 14, 2005. Pain, limited flexion, extremely restricted lateral bending and extension, and negative straight leg raise bilaterally were noted. Medications were prescribed. (A.R. 199-200.) On July 22, 2005, Henry H. Kang, M.D., Ph.D., certified in physical medicine and rehabilitation, diagnosed low back pain with discogenic disease, sacroiliitis, and muscle spasm, and prescribed medication, moist hot pack, and ambulation exercises. (A.R. 182.) Additional objective signs developed with respect to Plaintiff's lumbar spine pain and radiculitis from the autumn of 2005 through 2007. (A.R. 209-20, 224-30.) A state agency physician rendered an opinion in April 2006. (A.R. 231-38.) Plaintiff was released to work in June 2006 and thereafter was considered disabled in October 2006 due to his lumbar spine injury. Additional treatment occurred in 2007 with temporary total disability through June 17, 2007. (A.R. 242-79.) In 2007, a CT scan of the lumbar spine and lumbar diskogram performed at UCSF Medical Center revealed a left dorsolateral full thickness tear at L4-5 entering a lateral disc protrusion with moderate left neural foraminal narrowing at L4-5 but no right neural foraminal narrowing and no significant canal stenosis. At L5-S1, there was a posterior midline tear filling a central disc protrusion with no canal stenosis but moderate right neural foraminal narrowing and mild left neural foraminal narrowing. (A.R. 433-35.) An agreed medical examiner rendered a report in July 2008. (A.R. 447-54.)

was easily distracted with his family. The doctor had to recommend to the Department of Motor Vehicles that Plaintiff not drive.

A CT scan of Plaintiff's head with and without contrast performed on July 12, 2005, revealed no evidence of intracranial hemorrhage, mass effect, or infarct. There were multiple, small calcifications in the internal capsule, particularly on the right, and in the cerebral cortex bilaterally, suggesting cysticercosis. (A.R. 201, 222, 363.) Cysticercosis serology was positive on July 27, 2005. (A.R. 198, 360.)

On July 27, 2005, Plaintiff reported to Dr. Zimmermann that he had not had any recurrent seizures; Dr. Zimmermann continued Dilantin and informed Plaintiff that his symptoms did not warrant any disability at that time; he would refer Plaintiff to a neurologist. (A.R. 198, 358.) Plaintiff's cysticercosis would be treated with Albendazole. (A.R. 359.) On August 19, 2005, Plaintiff reported that he had been doing all right, had not had any seizure, was prodromal but never lost consciousness, and was taking Albendazole in addition to Dilantin. However, it was also noted that he had complained of two "episodes" recently. (A.R. 195-96.)

On October 25, 2005, Plaintiff reported that he had been doing all right but been experiencing absence seizures about once a month. Plaintiff reported difficulty learning and exhibited deficits in calculation and immediate recall. Dr. Zimmermann diagnosed neurocysticercosis and stable seizure disorder; he noted that they would fill out forms for INS "to try to waive him from the exams since probably he is not going to be able to pass

8

it due to his physical condition." (A.R. 194, 354.)

Between October 2005 and March 2008, Plaintiff was treated by neurologist Mythili Sundaresan, M.D. (A.R. 376-92.) In October 2005, Plaintiff complained of seizures with loss of consciousness at least twice a month, but it was also related that at some time he had been free of seizures for four years. (A.R. 391.) In November 2005, Plaintiff reported that his last seizure had been two weeks before; his Dilantin dose was increased and he was referred to mental health. (A.R. 390.)

In December 2005, Plaintiff reported to Dr. Sundaresan that his last seizure was about a year before. (A.R. 386.) Dr. Sundaresan had increased his Dilantin dose. His Zoloft dose was increased for panic attacks. Plaintiff's anxiety and seizure disorder were noted as stable. (A.R. 350.) An EEG performed on December 2, 2005, was normal. (A.R. 389.) In February 2006, Plaintiff reported that his anxiety was still present, but otherwise he had no complaints. (A.R. 346.) In March 2006, Dr. Zimmermann assessed absence seizures and memory impairment as shown on the Folstein Mini-Mental Status Exam. (A.R. 339.) In September 2006, Plaintiff reported that he had had no seizures in the last couple of months, thought he should obtain disability, and reported occasional depression because of seizures. Zoloft was restarted, and neuropsychiatric evaluation was planned. However, Plaintiff declined because he was going to see another doctor. (A.R. 333.)

In late 2006 and early 2007, Plaintiff was treated by S. S. Samrao, M.D., for recurrent seizures, occurring once or twice a week, unrelated to activity, and accompanied by upset stomach and

blacking out. Dr. Samrao assessed depression with anxiety neurosis, and rule out pseudoseizures; obesity; and latent diabetes, with treatment by Paxil for depression and Lorazepam for anxiety. Other anti-seizure medication was not needed. (A.R. 294.) Plaintiff was treated with Toradol and Reglan, which improved his symptoms of headache and nausea. (A.R. 302-03.) The medication helped a little and was adjusted. (A.R. 292.) Then Effexor XR and Zyprexa were prescribed and increased. (A.R. 290-91.) In December 2006, Dr. Samrao assessed Plaintiff with depression, chronic headaches due to depression, seizures, and history of neurocystic sarcosis; medications were Effexor, which was increased, and Zyprexa. (A.R. 289.) In January 2007, after reviewing Plaintiff's CAT scan that revealed multiple lesions of cranial cysticercosis but otherwise no tumors, Dr. Samrao assessed cranial cysticercosis--benign, seizures since age 17, stress, and depression. He explained to Plaintiff that he did not find any reason for him to give him a waiver, and that perhaps he should go to mental health, where he would be referred; he noted, "Again, counseling done that his cranial condition is benign." (A.R. 288.)

In February 2007, Plaintiff returned to the clinic and was told by Dr. Denkabe that he needed to be seen by a neurologist before Plaintiff could be evaluated for disability. (A.R. 331.) Plaintiff reported to Dr. Sundaresan that his last seizure was in December 2006. Dr. Sundaresan noted that Plaintiff's five-hour glucose tolerance test showed a tendency towards hypoglycemia, which could worsen seizures, so Plaintiff was prescribed a diet of small, frequent meals that were high in protein and low in

carbohydrates. (A.R. 379.)

Plaintiff visited Madera County Mental Health from February through November 2007. (A.R. 393-427.) Linda Negrete, M.S.W./A.C.S.W., assessed a depressive disorder not otherwise specified with a global assessment of functioning (GAF) of fifty in February. (A.R. 427.) Plaintiff reported having been depressed for two years because of inability to work because of seizures. He reported that he had gotten off the epilepsy medication for some days and that is when he had the seizures; further, his wife had told him that when he did not take his medication as we was supposed to, he had acted out and gone out of control, and his children had observed it. (A.R. 424.) He had appropriate affect, depressed mood, was well-groomed and calm, had intact thought process, impaired immediate memory, normal speech, intact judgment and insight, and was fully oriented. He had no impairment in living arrangements, moderate impairment in social relationships, and severe impairment in health and daily activities. (A.R. 425.)

In March 2007, Plaintiff reported to Ana Mendoza, M.D., a psychiatrist, that he had been irritable because of loss of memory, which prevented him from learning what to do at work. Dr. Mendoza assessed depressive disorder with a GAF of fifty. Zyprexa was stopped because of excessive sedation. Plaintiff's seizure disorder was controlled with Phenitoin. His affect was constricted, mood anxious and depressed, thought process was blocking, concentration was decreased, memory was impaired, speech normal, and judgment and insight were fair. He knew how to read and had average intellectual functioning. (A.R. 416-20.) In

April, he explained that his depression depended on whether there was hope in his SSI case. (A.R. 412.) In May 2007, he reported feeling less depressed with symptoms of irritability and fatigue, and improved mood and patience with less arguments with this wife and children, due to taking Prozac for a week. His memory continued to be poor. (A.R. 409.) In June 2007, Plaintiff reported that his seizure disorder was controlled with Dilantin; for the last year or more, four to five times a month he would feel as if a seizure were coming, but he and his daughter confirmed that he had had no actual seizure. (A.R. 404.) His affect was broad and his mood calmer, and the medication prescribed by the psychiatrist had helped him feel less depressed and anxious. (A.R. 403.)

In July 2007, Dr. Denkabe checked Plaintiff's seizure disorder and characterized Plaintiff's past seizures as absence seizures. The record is unclear, but Plaintiff reported, or Dr. Denkabe opined, that Plaintiff's cysticercosis did not affect his ability to perform daily activities. (A.R. 325.)

In August 2007, Plaintiff reported that the Prozac was not helping with the depression, but the Norco relieved his pain, and Dilantin had reduced the number and intensity of seizures. (A.R. 402.) He reported having no seizures lately but experiencing the aura; he had impaired memory. (A.R. 400.) In September, psychiatry services were discontinued after some baseline progress with some improvement in affect as social factors improved; Plaintiff was referred to a neurologist because it was determined that his depression was due to his medical condition. His judgment and insight were fair to good, memory unchanged,

affect broad, and mood and sleep pattern better. (A.R. 395, 397-98.) He was discharged in October 2007 after individual therapy and medication, with moderate improvement in his depression and anxiety, and fair prognosis. The diagnosis of Ana E. Mendoza, M.D., was dementia due to GMC-neurocysticerosis; no diagnosis on Axis II; epilepsy; and a GAF of 50. If Plaintiff needed medications, he was to obtain in from his primary care physician. (A.R. 394.)

On August 10, 2007, Dr. Ricardo Antonio Carrillo, Ph.D., performed a neuropsychological evaluation upon referral in connection with Plaintiff's application for citizenship, and specifically, his attempt to file a "N-648" or "Medical Certification for Disability Exceptions," which had been cited as incomplete. (A.R. 280-86.) Dr. Zimmermann, who had originally filled out the form, had moved from the Madera area. Dr. Carrillo reviewed records of cerebral tomography and other medical records, and he performed a mental status exam and brief neuropsychological evaluation that could not be completed but that reflected that Plaintiff met the criteria for severe impairment in all areas of functioning. (A.R. 281.)

Plaintiff suffered from a seizure disorder caused by "nuerocysticercosis" (cerebral tapeworm infection) and thus sought a medical disability waiver in his immigration application because he was not able to process minimal cognitive and emotional stimuli as a result of diffuse damage to the cerebral cortex. (A.R. 280.) Plaintiff reported debilitating grand mal seizures, severe bouts of depression and clinical depression, anhedonia, disorientation, severe memory impairment lasting many

hours in a day's time, severe anxiety, suicidal thoughts, and inability to drive.

Dr. Carrillo's examination of Plaintiff reflected no physical abnormalities. Plaintiff had coherent and fluid speech, lucid thinking with no indication of a thought disorder, flat, numb, depressed, and anxious mood and affect, a general emotional state described as "desperate," severely impaired judgment, and severe thoughts of suicide without plans. Plaintiff was slow to respond, and his memory was severely impaired. He became disoriented to time and situation and perseverated at times, repeating things he had earlier disclosed without knowledge of repeating them. He could not remember the day, time, year, simple digits forward or backward, or beyond two digits; immediate recall was severely impaired; he lacked the capacity for abstract thinking; and he was unable to recognize simple shapes or replicate figures. The test results indicated severe impairment in the entire cortex.

The left hemisphere was responsible for language, analysis, and abstract thinking in the language realm; he could not abstract, thus any language-oriented task, such as studying for a citizenship exam, would not be possible. He was not able to read, comprehend, or recall what he was expected to answer; he would have a tendency to become confused and disoriented. (A.R. 282.)

The right hemisphere was responsible for spatial relations, emotionality, synthesis, orientation, equilibrium, and physical memory. Plaintiff was significantly impaired in this area, so he could not make sense of figures or puzzles, drive, or work with his hands. He could no longer perform tasks that were second

nature to him, such as field work or driving. Ability to recognize signs and directions, put together objects with his hands, and abstract ability to recognize and make sense of his emotions were significantly impaired. He knew he was disabled, but he still wanted to attain his citizenship for the sake of his family. (A.R. 282.)

Dr. Carrillo's diagnosis was dementia due to epilepsy and "nuerocysticercosis," dysthymic disorder, late onset, suicidal ideation, with diagnosis on Axis II deferred. (A.R. 282.) He opined on Axis IV that Plaintiff was disabled physically, mentally, and psychologically secondary to the dementia; he was unable to work, drive, or manage his personal affairs and was dependent upon his family; and the GAF was 25, reflecting severe impairment with suicidal ideation. (A.R. 282.) The recommendation was that he not drive and be given a disability exception for his citizenship application. (A.R. 283.) He was unable to learn or to demonstrate the ability to speak, read, or write English. (A.R. 284-86.)

In October 2007, Plaintiff reported that he was not sure but thought he had about five seizures per month, although he had not had any "full" seizures. (A.R. 322-24.) He did not work and helped minimally around the house. Examination revealed no abnormal findings. (A.R. 323.) The assessment was seizure disorder, history of cysticercosis, and chronic low back pain secondary to disk herniation per patient. (A.R. 323.)

In November 2007, he reported to Dr. Sundaresan that he had at least four to five seizures a month; his last seizure was six days before. (A.R. 385.)

A CT scan of the brain with and without contrast performed on December 6, 2007, showed multiple calcifications present bilaterally most likely due to cysticercosis; no focal masses or edema; no fluid collections; and no enhancing lesions. (A.R. 384.)

In February 2008, Plaintiff's grand-mal seizures were described as stable. (A.R. 321.) Plaintiff was prescribed a special diet to address his tendency to hypoglycemia, which Dr. Sundaresan noted could worsen his seizures. He believed Plaintiff had four to five seizures in a month. (A.R. 379.)

In March 2008, Plaintiff reported more frequent seizures and increasing memory loss. (A.R. 318.) Dr. Sundaresan noted on March 10, 2008, that although Plaintiff had been prescribed a diet high in protein, low in carbohydrates, and made up of small, frequent meals, he was still non-compliant. (A.R. 377.) The last seizure had been three days before. (A.R. 377.)

On March 13, 2008, Dr. Arthur Paredes, M.D., of the Darin M. Camarena Health Center, opined that Plaintiff could sit, stand, or walk zero hours; never lift or carry even less than five pounds; could use his hands for simple grasping but no pushing or pulling of arm controls or fine manipulation; and could not bend, squat, crawl, climb, kneel, or stoop, or be exposed to extremes of hot or cold, wetness, humidity, noise, vibration, fumes, odors, gases, dust, or hazards. (A.R. 308.) Plaintiff had seizures and was totally incapacitated from any work. (A.R. 308.)

On June 25, 2008, Dr. Arthur Paredes opined that Plaintiff had a disability that affected his ability to learn and/or demonstrate knowledge, to learn or demonstrate an ability to read

and write English, and or learn or demonstrate knowledge of
United States history and civics. The disability was a parasitic
growth in the brain causing mental impairment and seizures,
Echinocoosis infection, and generalized non-convulsive epilepsy,
causing trouble remembering phrases and commands worsened by a
seizure problem. (A.R. 444-46.)

V. <u>Plaintiff's Testimony</u>

Plaintiff could not recall his telephone number but could
recognize his address. (A.R. 28.) He no longer had a license, but
he usually drove his car once a week. (A.R. 29.) He had four or
five seizures per month; he had been taking the medication, so he
did not get the real strong ones so much. After a seizure, he
felt tired and depressed and had to rest. (A.R. 40-42.)

Plaintiff's memory problems were worsening; the only thing
the doctors did was to medicate so the seizures would not be as
strong. (A.R. 42.) He could concentrate for four or five minutes.
(A.R. 44.) He could read and write some in Spanish, although
sometimes he got words confused; he could not read or write
English but understood enough words to count to a hundred and
make purchases. (A.R. 30-31.) Plaintiff remembered some of his
work history, but he had difficulty remembering other parts.
(A.R. 31-35.) He could not remember things that happened more
than three months previously. (A.R. 33.) He could not work
because of lower back pain due to damaged discs, pain in the feet
and the head, seizures, memory problems, and depression. (A.R.
35.) He could sit ten to fifteen minutes, stand ten to twenty
minutes, walk ten to fifteen minutes, and lift a gallon of milk,
but he did not think he could lift ten pounds. A TENS unit and

oral medication numbed the pain but did not take it away completely, and at UCSF he was told he needed surgery for his back. (A.R. 36-39.)

VI. Plaintiff's Wife's Testimony

Cortensia Barragan, Plaintiff's wife, testified that Plaintiff had four seizures per month, which lasted a few seconds or a minute, and required rest for the remainder of the day. (A.R. 45-46.)

VII. Vocational Expert's Testimony

Mr. Shapiro, a vocational expert (VE), testified that Plaintiff could not perform his past relevant work, which was medium work; however, assuming that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, sit, stand, and walk a total of six hours in an eight-hour day, never climb ladders, ropes, or scaffolds, occasionally crouch, crawl, and climb ramps or stairs, frequently balance and kneel, and avoid even moderate exposure to hazards, he could perform the jobs of housekeeping cleaner, light and unskilled, DOT 323.687-014, with 53,600 jobs in California and about 406,500 nationally; raw shellfish preparer, light and unskilled, DOT 311.674-014, with about 4,500 positions in California and about 41,400 positions nationally; and agricultural produce sorter, light and unskilled, DOT 529.687-186, with about 1,300 positions in California and 3,600 nationally. Inability to remember anything more than three months past did not change his answer. (A.R. 47-48.) However, limitations from seizures and restrictions in concentration as described by Plaintiff in his testimony precluded employment. (A.R. 49-50.)

18

VIII. <u>Reports of Plaintiff and Third Parties</u>

Plaintiff reported on February 8, 2006, to the SSA that sometimes when he got seizures, he was a little groggy afterwards; however, when he was seizure free, he did well with his memory and concentration, could think, and did not need constant reminders. His memory problems did not affect his activities of daily living. (A.R. 141.)

Plaintiff's wife, son, and daughter reported in letters in 2007 and 2008 that Plaintiff had told his wife that the attacks came four to five times a month and that he felt really bad; he would lose consciousness and orientation. (A.R. 169.) Plaintiff's son reported that Plaintiff had attacks about four to five times a month; he lost his memory more every day and needed his family; his epileptic attacks did not allow him to get a job. (A.R. 171.) His daughter confirmed that he got the attacks four to five times, and she stated that Plaintiff said bad words without knowing what he said unconsciously; pills did not preclude the attacks, which did not have bad convulsions but caused loss of consciousness for seconds. His illness caused his depression. (A.R. 173.)

IX. <u>Rejection of Dr. Carrillo's Opinion</u>

Plaintiff argues that the ALJ ignored Plaintiff's mental impairments and the opinion of Ricardo Carrillo, Ph.D.; further, the ALJ failed to state legally sufficient reasons for rejecting Dr. Carrillo's opinion. The ALJ failed to consider the record as a whole, and the record lacked substantial evidence to support the ALJ's conclusions concerning Plaintiff's mental impairments.

A. <u>Legal Standards</u>

The standards for evaluating expert opinions have recently been summarized:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

B. Analysis

Here, the ALJ's treatment of Dr. Carrillo's opinion must be

considered in context. In the decision, the ALJ initially set forth a summary of the medical evidence. (A.R. 15-18.) The ALJ noted Plaintiff's subjective complaints of memory problems and limited concentration due to seizure disorder secondary to cysticercosis. (A.R. 17, 15.) The ALJ cited numerous clear and convincing reasons, supported by substantial evidence, for his conclusion that despite Plaintiff's having impairments that could reasonably have been expected to produce his symptoms, Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (A.R. 17.) The ALJ's reasons included inconsistencies in Plaintiff's testimony concerning his ability to remember, his admission that he drove weekly despite doctors' admonitions not to drive, his sitting for a one-hour hearing while claiming that he could sit for only ten to fifteen minutes at a time, his concentrating and participating throughout the hearing while claiming that he could concentrate for only a few minutes, the inconsistencies between Plaintiff's and Plaintiff's wife's reports concerning Plaintiff's seizures, Plaintiff's inconsistent statements concerning his seizures, Plaintiff's admissions that his seizures did not affect his activities of daily-living and that his concentration and memory were good when he was seizure-free; the mild or normal findings on examination and the opinions of various practitioners that contradicted Plaintiff's claims, including Dr. Zimmermann's statement that Plaintiff's symptoms did not warrant any disability at the time, Dr. Nugent's mild findings, Dr. Samrao's notation that Plaintiff's cranial cysticercosis was benign and

his failure to find a basis for a waiver, the note that Plaintiff's seizures and cystecercosis did not affect Plaintiff's day-to-day activities, and Dr. Sundaresan's note that Plaintiff's seizures were due in part to Plaintiff's noncompliance with diet. (A.R. 18.) The ALJ noted how historically Plaintiff had been able to work despite his seizure disorder from 1988 to the alleged onset date. (A.R. 18.) The ALJ also noted that Plaintiff visited physicians for waivers in connection with the citizenship exam, and he expressly concluded that the record suggested that Plaintiff was seeing physicians primarily in order to generate evidence for his SSI application and appeal rather than in a genuine attempt to obtain relief from his symptoms. (A.R. 18.)

Plaintiff does not challenge these findings. The Court notes them because they reflect the ALJ's evaluation of Plaintiff's credibility, which was pertinent to the reliability of the medical evidence that in turn rested on Plaintiff's reports.

The ALJ noted Dr. Carrillo's assessment that Plaintiff was not able to process minimal cognitive and emotional stimuli as a result of diffuse damage to the cerebral cortex, and his note that Plaintiff could not remember the date, time, year, or simple digits forward or backward; engage in abstract thought; make sense of figures or puzzles; or drive or work with his hands. (A.R. 17.) However, the ALJ noted Plaintiff's inconsistent statements that his impairments did not affect his activities of daily living and that he did well with concentration and memory when he was seizure-free. The ALJ referred to the medical evidence in general, noting the absence of hospitalizations for Plaintiff's seizures and his failure to visit a neurologist as

directed. (A.R. 18.) In this course of reasoning, the ALJ relied on the evidence that was inconsistent with the severely debilitating symptoms that Plaintiff reported or represented to Dr. Carrillo.

This reasoning was legitimate, specific, and even clear and convincing. It is established that important factors in evaluating expert opinions include the amount of relevant evidence that supports the opinion, the quality of the explanation provided, the consistency of the medical opinion with the record as a whole, the specialty of the physician providing the opinion, and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 416.927(d); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

The ALJ also noted that Dr. Carrillo's opinion was not written for the purpose of evaluating Plaintiff's ability to work; rather, it was for the specific purpose of obtaining a waiver of a citizenship exam that involved English language skills and knowledge of American civics and history. (A.R. 18.) It is evident from the purpose of the examination that it centered on a citizenship exam process that involved a specific set of advanced literacy and learning skills; thus, the doctor's opinion regarding a citizenship exam waiver does not necessarily preclude an ability to work, which involves a much broader, more inclusive set of basic work activities. When Dr. Carrillo referred to Plaintiff's inability to work, it is not clear what

23

set of activities was involved. The ALJ's reasoning was specific, legitimate, and even clear and convincing.

Further, the ALJ noted that Dr. Carrillo's opinion did not indicate how Plaintiff had been able to work steadily from 1988 to his alleged onset date. (A.R. 18.) The opinion was insufficient with respect to addressing the pertinent facts and providing an adequate explanation of the conclusions. The ALJ's reasoning was supported by the record and was specific, legitimate, clear, and convincing.

Finally, the ALJ gave great weight to the opinions of the state agency physicians that Plaintiff could perform light work with some additional limitations because their limitations were consistent with the treatment history. (A.R. 18.) The ALJ by implication found that Dr. Carrillo's limitations were inconsistent with the treatment history. Further, the ALJ expressly reviewed the inconsistent findings or opinions of treating physicians Zimmermann, Nugent, Samrao, Sundaresan, Dankabe, and even PA-C Evangelina Nunez. (A.R. 18.) The ALJ thus concluded that Dr. Carrillo's limitations were inconsistent with the overall medical record.

Contrary to Plaintiff's assertion, the ALJ did not ignore Dr. Carrillo's opinion; rather, he noted Dr. Carrillo's examination and assessment (A.R. 16, 17), detailed the inconsistencies that brought Dr. Carrillo's opinion into question (A.R. 17-18), and stated additional reasons for not giving weight to Dr. Carrillo's opinion (A.R. 18). Although the ALJ did not affirmatively express the precise lack of weight assigned to Dr. Carrillo's opinion, it was clear that the ALJ discounted Dr.

Carrillo's opinion and instead placed great weight on other, specified opinions found to be consistent with the overall record. The ALJ thus stated multiple reasons, supported by substantial evidence in the record, that were specific and legitimate and, in the circumstances of the present case, clear and convincing in force, for declining to give weight to the opinion of Dr. Carrillo.

The ALJ's conclusion was supported by substantial evidence. It was Plaintiff's burden to provide evidence of disability at step four and determination of RFC. The ALJ rejected the evidence that would have supported a finding of disability based on Plaintiff's functioning due to cysticercosis/seizure disorder. The ALJ's conclusion was proper.

X. Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Rafael Barragan Ochoa.

IT IS SO ORDERED.


Dated:  February 25, 2010                    /s/ Sandra M. Snyder
                                       UNITED STATES MAGISTRATE JUDGE